**FOX ROTHSCHILD LLP**
Michael G. Menkowitz, Esq.
Jesse M. Harris, Esq.
Matthew A. Skolnick, Esq.
Two Commerce Square
2001 Market Street – Suite 1700
Philadelphia, PA 19103
215-299-2000
mmenkowitz@foxrothschild.com
jesseharris@foxrothschild.com
mskolnick@foxrothschild.com

*Proposed Attorneys to Andrew Sklar, Chapter 7 Trustee*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| | : | |
| Iron Hill Brewery, LLC, *et al.*,[1] | : | Case No. 25-20476 (JNP) |
| | : | (Joint Administration Requested) |
| Debtors. | : | |
| | : | |

---

[1] The twenty-three (23) Debtors in these cases, along with the last four digits of their federal tax identification numbers are: (i) C&D Brewing Company of Marlton, LLC (7250) (Case No. 25-20450-JNP); (ii) C&D Brewing Company of Voorhees, LLC (9118) (Case No. 25-20451-JNP); (iii) Chesapeake & Delaware Brewing Company, LLC (2130) (Case No. 25-20452-JNP); (iv) C&D Brewing Company of Lancaster, LLC (5818) (Case No. 25-20453-JNP); (v) C&D Brewing Company of Wilmington, LLC (4042) (Case No. 25-20454-JNP); (vi) C&D Brewing Company of Media, LLC (0706) (Case No. 25-20455-JNP); (vii) Iron Hill Brewery of Lehigh Valley, LLC (3431) (Case No. 25-20456-JNP); (viii) C&D Brewing Company of Chestnut Hill, LLC (3404) (Case No. 25-20457-JNP); (ix) Iron Hill Brewery of Columbia, LLC (3635) (Case No. 25-20458-JNP); (x) Iron Hill Brewery of Perimeter, LLC (0005) (Case No. 25-20459-JNP); (xi) C&D Brewing Company of Montgomeryville, LLC (9479) (Case No. 25-20460-JNP); (xii) Iron Hill Brewery of Eagleview, LLC (4703) (Case No. 25-20461-JNP); (xiii) C&D Brewing Company of Ardmore, LLC (0123) (Case No. 25-20462-JNP); (xiv) Iron Hill Brewery of Buckhead, LLC (1794) (Case No. 25-20463-JNP); (xv) Iron Hill Brewery of South Carolina, LLC (1851) (Case No. 25-20464-JNP); (xvi) C&D Brewing Company of Phoenixville, LLC (1313) (Case No. 25-20465-JNP); (xvii) Iron Hill Brewery of Newtown, LLC (6182) (Case No. 25-20466-JNP); (xviii) C&D Brewing Company of Pennsylvania, LLC (0585) (Case No. 25-20468-JNP); (xix) Iron Hill Brewery of Hershey, LLC (5290) (Case No. 25-20469-JNP); (xx) C&D Brewing Company of Huntingdon Valley, LLC (3213) (Case No. 25-20470-JNP); (xxi) Iron Hill Brewery of Rehoboth Beach, LLC (8467) (Case No. 25-20471-JNP); (xxii) Iron Hill Brewery East Market, LLC (9863) (Case No. 25-20472-JNP); (xxiii) Iron Hill Brewery, LLC (5042) (Case No. 25-20476-JNP).

**CHAPTER 7 TRUSTEE'S MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE ASSET PURCHASE AGREEMENT AND AUTHORIZING (A) THE PRIVATE SALE OF THE DEBTORS' RIGHT, TITLE, AND INTEREST IN SUBSTANTIALLY ALL THE ASSETS ASSOCIATED WITH CERTAIN OF THE DEBTORS' LOCATIONS, PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE, FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, AND (B) THE AGREEMENT WITH THE BUYER REGARDING THE ALLOCATION OF OTHER LIQUIDATION PROCEEDS; (II) APPROVING THE PROPOSED PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF**

Andrew Sklar (the "Trustee" or "Seller"), the Chapter 7 trustee for the estates of the above-captioned debtors (collectively, the "Debtors"), by and through his proposed attorneys, Fox Rothschild LLP, respectfully requests the entry of an Order (the "Sale Order"), substantially in the form attached hereto as **Exhibit A**, (i) approving the asset purchase agreement (the "Agreement")[2] by and between the Trustee and IH Restaurants LLC and its designees set forth on Schedule 3 to the Agreement (the "Buyer"), which provides for (a) the private sale to Buyer of the Debtors' right, title, and interest in substantially all the assets (the "Acquired Location Set 1 Assets") associated with the twelve (12) locations of the Debtors' set forth on Schedule 1-(a) to the Agreement ("Location Set 1"), free and clear of all liens, claims, interests, and encumbrances, and (b) an allocation between the Trustee and Buyer of certain proceeds with respect to the liquidation and sale by the Trustee of substantially all the assets (the "Liquidated Location Set 2 Assets", together with the Acquired Location Set 1 Assets, the "Assets") of the Debtors associated with the Debtors' remaining locations not included in Location Set 1, including the seven (7) locations set forth on Schedule 1-(b) to the Agreement ("Location Set 2", together with Location Set 1, the "Debtor Locations") (all collectively, the "Sale Transaction"); (ii) approving the Trustee's proposed procedures for the assumption and assignment of the Debtors' executory contracts and unexpired

_____

[2] Capitalized terms not defined herein shall have such meanings ascribed to them as in the Agreement. A copy of the Agreement is attached to the Sale Order as Exhibit A and incorporated by reference herein.

leases in connection with the Sale Transaction (the "Assumption and Assignment Procedures"), including the potential assumption and assignment of the contracts and leases specifically listed on Schedule 1 (each, a "Contract") to the notice attached hereto as **Exhibit B** (the "Potential Contract Assumption Notice"), which notice is being served contemporaneously with this Motion on each relevant non-debtor counterparty (each, a "Counterparty") to the Contracts and provides notice to such Counterparties of (a) the Trustee's calculation of the amount necessary to cure any defaults under the applicable Contracts (the "Cure Amounts"), and (b) certain other information regarding the potential assumption and assignment of the Contracts in connection with the Sale Transaction; and (iii) granting related relief (the "Motion").  In support of the Motion, the Trustee respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The Trustee seeks this Court's approval of a value-maximizing Sale Transaction, consideration for which includes, (i) a credit bid of $12,000,000.00 on account of secured debt, (ii) the assumption of certain Assumed Liabilities, including certain Cure Amounts and Carrying Costs associated with the Acquired Location Set 1 Assets, and (iii) additional cash consideration to be paid for the acquisition of Liquor Licenses associated with Debtors' Delaware locations.  In addition to the sale of the Acquired Location Set 1 Assets, the Agreement provides for a carve-out from Buyer's collateral, allocating to the Trustee for the benefit of the estates (collectively, the "Carve-Out"): (i) ninety percent (90%) of all sale proceeds from the liquidation and sale of all inventory and equipment located in Location Set 2, and (ii) forty percent (40%) of the proceeds with respect to the remaining Liquidated Location Set 2 Assets and other Split Assets (as set forth in greater detail below and in the Agreement), with a guaranteed minimum recovery of at least $400,000.00 on account of such proceeds.  Excluded Assets include, but are not limited to,

commercial tort claims, D&O claims, and avoidance actions under Chapter 5 of the Bankruptcy Code.

2.       Prior to the Petition Date, the Debtors engaged in an extensive marketing campaign that ultimately resulted in no firm offers.  In addition to the bid from Buyer, the Trustee received several other postpetition offers as well.  However, given the present value of the Assets and the extent of Buyer's Secured Claim, it quickly became clear that no other party would be willing or able to compete with the bid submitted by Buyer.  As such, it is the Trustee's business judgment that entering into the Agreement and engaging in a prompt private sale with Buyer would be more beneficial than a prolonged public sale process and would save the estates from needlessly incurring excessive administrative costs.  Accordingly, the Trustee submits that the Sale Transaction with Buyer represents the highest and best offer available for the Debtors' Assets, under the circumstances, and is most likely to yield meaningful recoveries for the estates and the Debtors' unsecured creditors.

## JURISDICTION AND VENUE

3.       This Court has jurisdiction over this Motion, pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding, pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

4.       Venue of this proceeding and this Motion is proper in this district, pursuant to 28 U.S.C. §§ 1408 and 1409.

5.       The statutory predicates for the relief requested in this Motion are Sections 105, 363(b), 363(f), 363(k), 363(m), and 365 of Title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004-1 of the Local Rules for the District of New Jersey (the "Local Rules").

4

# BACKGROUND

### A.    The Debtors and the Commencement of the Chapter 7 Cases

6.    On October 3, 2025 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey (the "Court"), commencing these Chapter 7 cases (the "Chapter 7 Cases").[3]

7.    On October 6, 2025, the Office of the United States Trustee appointed the Trustee as Chapter 7 trustee, which appointment remains in effect [Docket No. 3].

8.    Prior to the Petition Date, the Debtors operated a craft brewery and scratch restaurant chain (the "Business"), with nineteen (19) different locations across the east coast of the United States, including in Delaware, Pennsylvania, New Jersey, Georgia, and South Carolina.

9.    As of the Petition Date, the Debtors' estates consist of various industrial machines, inventory, and accessories used in connection with the development and production of craft beers, as well as other equipment, furniture, and fixtures used to operate full-service restaurants and bars (collectively, the "Equipment").  Additionally, the Debtors own several valuable liquor licenses (the "Liquor Licenses") needed to sell alcohol at the Debtor Locations.  Moreover, the Debtors are party to several key contracts with numerous suppliers and customers (the "Executory Contracts") and certain unexpired leases with landlords at the Debtors' former restaurant sites (the "Unexpired Leases").

### B.    Prepetition Marketing Efforts and the Trustee's Selection of Buyer

10.    To address mounting liquidity problems as a result of over-expansion and certain health code violations, prior to the Petition Date, on or around January 2025, the Debtors came

---

[3] Debtor Iron Hill Brewery, LLC filed its voluntary petition on October 4, 2025.  Nevertheless, for purposes of this Motion, the Trustee will refer to the Petition Date for all the Debtors as October 3, 2025.

under new management.  Upon information and belief, promptly after taking over, the Debtors' new executives started pursuing certain restructuring and sale options for the Debtors' Business. The preliminary search included outreach to various investors and other potential parties in interest, but as the year progressed, it became apparent that a sale of the underlying Business would be the only viable option.

11.     Between August and September 2025, the Debtors were in contact with multiple parties who were interested in being potential buyers (collectively, the "Prepetition Interested Parties"), many of which were actively engaging in extensive due diligence into the Debtors' Business.  To facilitate these due diligence efforts, the Debtors established a data room and entered into non-disclosure agreements with several of the Prepetition Interested Parties.  A handful of the Prepetition Interested Parties had also conducted site visits at some of the Debtor Locations.

12.     Nevertheless, despite several months of efforts to market the Debtors' Assets and engage with the Prepetition Interested Parties, the Debtors did not receive any firm offers that would have enabled the Debtors to consummate a sale prior to the Petition Date.  Accordingly, on or around September 24, 2025, the Debtors made the decision to cease all operations and close the Debtor Locations.

13.     As indicated in the Debtors' Schedules, as of the Petition Date, the Debtors owed at least $17,250,000.00 in secured debt to BankUnited, N.A ("BankUnited") on account of a lien against substantially all the assets and personal property of the Debtors (the "Prepetition Secured Lien").

14.     Subsequently, BankUnited assigned all its right, title, and interest in the Prepetition Secured Lien to Buyer, and Buyer now holds a secured claim (the "Secured Claim") against the Debtors in an amount not less than $18,000,000.00 (the "Secured Debt").

15.    Since the Trustee's appointment, the Trustee and his professionals have quickly worked to understand the Debtors' Business, including the value and market for a potential sale of the Debtors' Assets.

16.    Promptly after the Petition Date, Buyer contacted the Trustee and his professionals to discuss the possibility of submitting a credit bid for the Debtors' Assets.  Within a matter of days, the Buyer submitted a bid, which was largely consistent with the terms of the Agreement attached hereto.

17.    Following receipt of Buyer's bid, the Trustee and his professionals received a handful of offers from other interested parties (collectively with Buyer, the "Postpetition Interested Parties", and together with the Prepetition Interested Partes, the "Interested Parties") for the purchase of the Debtors' Assets, none of which presented a bid that would provide value to the estates equal or greater to the combined value of (i) the amount of the Secured Debt that would be cancelled through Buyer's credit bid, (ii) Buyer's assumption of all Cure Amounts and Carrying Costs, and (iii) the Carve-Out for the benefit of the unsecured creditors.  Given the scope of the Prepetition Secured Lien and the amount of the Secured Debt, it quickly became clear that no other potential Buyer would be willing or able to exceed the bid proffered by Buyer.

18.    Accordingly, the Trustee determined that Buyer's bid presented the highest and best offer and, among other things, provided the maximum certainty of closing.  As such, the Trustee believes, in his business judgment, that the Agreement with the Buyer will maximize recoveries for the Debtors' creditors.

C.    **Salient Provisions of the Agreement**

19.     The key terms of the Agreement, in accordance with Local Rule 6004-1(a)(3), are

summarized as follows:[4]

| Provision | Summary Description |
|---|---|
| *Buyer* | IH Restaurants LLC and its designees, as set forth on Schedule 3 to the Agreement. |
| *Seller* | Andrew Sklar, solely in his capacity as Chapter 7 Trustee for the Debtors' estates. |
| *Acquired Location Set 1 Assets* | The Sale Transaction contemplates a sale of all of Seller's right, title, and interest in and to all of the assets, properties, goodwill, rights, and claims of Seller associated with the locations included in Location Set 1, as listed on Schedule 1-(a) to the Agreement (or such subset of Location Set 1 as Buyer agrees in writing before the date that is forty-five (45 calendar days after the Sale Order is entered (the "Acquired Location Set 1")), including, but not limited to, (i) all rights of the Seller under the Contracts to be listed on Schedule 2 to the Agreement (the "Assumed Contracts"); (ii) all inventory and work-in-process related to the Business located in Acquired Location Set 1; (iii) all equipment, machinery, office equipment, and other tangible personal property used or usable in the Business located in Acquired Location Set 1; (iv) all the intellectual property used by the Debtors; (v) the Liquor Licenses associated with Location Set 1; and (vi) all cash and cash equivalents.  Agreement at § 1(a). |
| *Assumption and Assignment of Assumed Contracts* | Buyer is acquiring all rights of Seller under the Assumed Contracts that are specifically listed on Schedule 2 to the Agreement; ***provided, however***, that Buyer reserves all rights to remove any of the Contracts listed on Potential Contract Assumption Notice up through forty-five (45) calendar days after the Sale Order is entered, consistent with the Assumption and Assignment Procedures outlined in the Motion and Sale Order.  Agreement at §1(a)(i). |
| *Location Set 1 Carrying Costs and Cure Amounts* | Buyer agrees to pay all carrying costs, if any, associated with operating each location that is part of Location Set 1 incurred from the date of the Bankruptcy Court Sale hearing (the "Sale Hearing") through the date on which Buyer notifies Seller in |

---

[4] The descriptions in this Section are only a summary certain provisions of the Agreement, and the terms of the Agreement control in the event of any inconsistency.

|  | writing whether Buyer will purchase the assets associated with the particular Debtor location, including, without limitation, all costs for operation and for all unpaid rent, fees and other applicable sums due and unpaid under any Assumed Contract (collectively, the "<u>Carrying Costs</u>"). Agreement at ¶ 1(b)(i).<br><br>Buyer also agrees to pay all Cure Amounts for all unpaid rent, fees, and other applicable sums due and unpaid under any real estate leases, equipment leases, and other Assumed Contracts of the Debtors that Buyer assumes and that are associated with the Acquired Location Set 1 Assets, excluding all Carrying Costs previously paid by Buyer. Agreement at § 1(b)(ii). |
|---|---|
| *Liquidation of Location Set 2 Assets* | Seller will liquidate substantially all assets of the Debtors associated with Location Set 2, including but not limited to, the locations set forth on <u>Schedule 1-(b)</u> to the Agreement, by auction or otherwise, including, without limitation, all associated equipment and Liquor Licenses.  Agreement at § 1(c). |
| *Insurance* | Promptly after the date of execution of the Agreement, using the funds provided for in Section 6(b)(ii)(C), Seller shall purchase general liability insurance and any other insurance appropriate for all the Debtor Locations; provided, however, that Buyer shall purchase property insurance for all properties associated with Location Set 1.  Agreement at § 1(d). |
| *Excluded Assets* | The Acquired Location Set 1 Assets shall not include the Excluded Assets and Buyer agrees that Buyer has no lien or security interest on any of the assets listed in Subsections (i)-(ii), (iv)-(vii), (ix), and (x) below, or has otherwise agreed for purposes of this Agreement to provide to the estate, as the case may be.   The term "<u>Excluded Assets</u>" means the following assets associated with all Debtor Locations: (i) Certificates of Formation, seals, unit certificate books, minute books, stock ledgers, and other documents relating solely to the organization, maintenance, and existence of the Debtors as limited liability companies; (ii) any legal or beneficial interests in the shares of the Debtors or Seller on in equity that the Debtors or Seller own; (iii) all accounts, pre-paid expenses, advance payments, prepayments, security deposits, deferred charges, letters of credit, and other deposits included in the pre-paid assets or rights of payment, in each case, of the Debtors or Seller, and any claim, cause |

| | of action, remedy, or right related to the foregoing (for the avoidance of doubt, excluding those claims or causes of action discussed in Subsection (iv)), except for all deposits and prepayments directly attributable to Location Set 1 that Buyer is acquiring and has a lien on; (iv) all claims or causes of action relating to the Debtors or Seller and its bankruptcy estate, including actions under Chapter 5 of the Bankruptcy Code and/or any other applicable federal or state law, and all proceeds and rights to proceeds therefrom; (v) all commercial tort claims and D&O claims of the Debtors; (vi) all rolling stock of the Debtors; (vii) any (a) books and records that the Debtors or Seller are required by law to retain, provided that Buyer shall receive a copy thereof; (b) duplicate copies of any records as necessary to enable the Debtors or Seller to file tax returns and reports; and (c) any books and records relating to the organization, ownership, existence, or corporate record keeping of the Debtors or Seller; (viii) any insurance policies or rights to proceeds thereof, including, without limitation, relating to the assets, properties, business, or operations of the Debtors or Seller and the Debtor Locations, but excluding items set forth in Subsection (v), insurance proceeds relating the claim associated with the damage at the Center City, Philadelphia, PA location, and all insurance proceeds directly attributable to Location Set 1 that Buyer is acquiring and has a lien on (all assets set forth in Subsections (iii) and (viii) shall be referred to as the "<u>Split Assets</u>"); (ix) all tax losses and tax loss carry forwards of the Debtors or Seller and rights to receive refunds, credits, and credit carry forward with respect to any taxes of the Debtors or Seller; and (x) all rights of the Debtors or Seller under the Agreement and the other agreements and instruments executed and delivered in connection with the Agreement (the "<u>Transaction Documents</u>"). Agreement at § 1(e). |
|---|---|
| *Closing* | Title to all of the Acquired Location Set 1 Assets shall pass to Buyer upon the closing of the transaction (the "<u>Closing</u>"), which must occur within two (2) business days after all conditions contained in Section 8 of the Agreement have been met (the "<u>Closing Date</u>"), provided all other conditions to closing contained in the Agreement are met. Agreement at § 2. |
| *As is, Where is* | The Acquired Location Set 1 Assets are being sold and transferred to Buyer "as is, where is," and Seller makes no representations or warranties whatsoever, express or implied, with respect to any matter related to the Acquired Location |

| | Set 1 Assets.  Without limiting the foregoing, Seller hereby disclaims any warranty, express or implied, of merchantability or fitness for any particular purpose as to any portion of the Acquired Location Set 1 Assets.  Agreement at § 3. |
|---|---|
| *Assumed Liabilities and Excluded Liabilities* | Buyer agrees to assume only the following liabilities of Seller: (i) all liabilities relating to or arising from the ownership of the Acquired Location Set 1 Assets after the Closing Date; and (ii) all Carrying Costs and Cure Amounts due, in accordance with the terms of the Agreement (collectively, the "<u>Assumed Liabilities</u>").  Agreement at § 4(a).<br><br>Notwithstanding any other provision in the Agreement, Buyer shall not assume or be liable for any liabilities of Seller or Debtor, of any kind, other than the Assumed Liabilities (the "<u>Excluded Liabilities</u>").  Agreement at § 4(b). |
| *Purchase Price and Credit Bid Pursuant to Section 363(k)* | The consideration for the Acquired Location Set 1 Assets shall be (i) a cancellation in the amount of Twelve Million Dollars ($12,000,000.00) of Debtors' outstanding loan from Buyer (the "<u>Credit Bid</u>"), (ii) Buyer's payment of all Cure Amounts and Carrying Costs, (iii) additional cash consideration to be paid by Buyer to the Seller for acquisition of the Liquor Licenses associated with Debtors' Delaware locations, in the amount of $1,000.00 per license, and (iv) the assumption of the Assumed Liabilities (collectively, the "<u>Location Set 1 Purchase Price</u>").  Agreement at § 6(a). |
| *Allocation of Sale proceeds for Location Set 2 Assets (Carve-Out)* | Seller will receive and keep the following proceeds with respect to the Liquidated Location Set 2 Assets (the "<u>Seller's Proceeds</u>"): (A) all sale proceeds received from the liquidation and sale of the Liquor Licenses for the New Jersey Debtor Locations of the Debtors and for the Excluded Assets (other than the Split Assets); (B) ninety percent (90%) of all sale proceeds received from the liquidation and sale of inventory and equipment located in Location Set 2; and (C) forty percent (40%) of all sale proceeds received from the liquidation and sale of the following assets (other than liquidation of the assets set forth in Subsections (A) and (B) above): (i) all Liquidated Location Set 2 Assets, (ii) all Split Assets, and (iii) any other Debtor collateral not addressed in Section 6(b)(i) of the Agreement.  If Seller receives less than an aggregate of $400,000 for the liquidation of the assets set |

<table>
<tr><td></td><td>forth in this Subsection (C), Buyer shall pay such shortfall to Seller promptly upon request.  Agreement at § 6(b)(i).

Buyer will receive: (A) all sale proceeds received from the liquidation and sale of the Liquor Licenses for all Debtor Locations other than the New Jersey location; (B) ten percent (10%) of all sale proceeds received from the liquidation and sale of inventory and equipment located in Location Set 2; (C) All cash and cash equivalents associated with the Debtor Locations other than $10,000.00 that Seller can use to purchase liability insurance; and (D) sixty percent (60%) of all sale proceeds received from the liquidation and sale of all Liquidated Location Set 2 Assets, Split Assets, and any other collateral not addressed in the Agreement, excluding the Seller's Proceeds, which Seller will keep in their entirety (other than liquidation of the assets set forth in Subsection (A) above).   The sum that Buyer will receive under Subsections (B)-(D) above shall be capped at the remaining Secured Claim of Buyer after deducting the Credit Bid. Agreement at § 6(b)(ii).

Buyer will receive on account of its deficiency claim its pro rata distribution made by Seller to unsecured creditors. Agreement at § 6(b)(iii).</td></tr>
<tr><td>*Closing Conditions*</td><td>The Sale Transaction contemplated by the Agreement is subject to the following conditions:

    (a) The execution and delivery of a signed copy of the Agreement by the parties.

    (b) Buyer's delivery of the Location Set 1 Purchase Price to Seller at Closing, and payment of all Carrying Costs and Cure Amounts.

    (c) The representations and warranties of Seller, on behalf of the Debtors, in Section 10 of the Agreement shall be true and correct, as of the date of the Agreement and up through the Closing Date.

    (d) No temporary restraining orders, injunctions, other judgments, or orders issued by any court of competent jurisdiction, or other statute, law, rule, legal restraint, or prohibition (collectively, "Restraints") shall be in effect enjoining, restraining, prohibiting, or preventing the consummation of the</td></tr>
</table>

|  | Sale Transaction or otherwise making the consummation of the Sale Transaction illegal. |
|  | (e) The Bankruptcy Court shall have entered the Sale order in form and substance satisfactory to Buyer in its reasonable discretion and which shall be a Final Order (as defined in Section 8(e) the Agreement). |
|  | (f) Buyer and Seller shall have received all necessary regulatory and governmental approvals with respect to the Sale Transaction contemplated under the Agreement and all waiting periods applicable to such approval shall have expired. |
|  | (g) Seller shall have performed in all material respects all obligations required to be performed by it under the Agreement at or prior to the Closing Date. |
|  | (h) There shall not be any pending or threatened litigation that could reasonably be expected to result in any Restraint having the effect set forth in Subsection (d). |
|  | (i) Compliance with all terms and conditions contained in the Agreement and approval by the Bankruptcy Court. |
|  | (j) Delivery of all required documents set forth in Sections 8 and 9 of the Agreement. |
|  | (k) No finders' fee, broker, or other fee shall be payable by Buyer. |
|  | (l) Promptly after signing the Agreement, Buyer shall buy and provide to Seller evidence of (i) property insurance for all properties associated with Location Set 1. Seller shall purchase general liability insurance and any other insurance appropriate for all Debtor Locations using the funds provided for in Section 6(b)(ii)(C). |
|  | Agreement at § 8. |
| *End Date* | The Agreement may be terminated by Seller or Buyer if the Closing shall not have been consummated on or before December 31, 2025 or such other date as the parties may agree to in writing (the "<u>End Date</u>"), unless the party seeking |

|  | termination is in breach of its obligations under the Agreement. Agreement at § 12(a)(ii). |
|---|---|
| *Deposit* | No deposit required. |
| *Broker or Sales Agent's Fees or Commissions* | No portion of the Purchase price, or any separate fee or commission, will be paid to a broker or sales agent in connection with the Sale Transaction. Agreement at §§ 8(k) and 10(c). |
| *Record Retention* | The Seller shall retain the following Excluded Assets: (i) Certificates of Formation, seals, unit certificate books, minute books, stock ledgers, and other documents relating solely to the organization, maintenance, and existence of the Debtors as limited liability companies, and (ii) any (a) books and records that the Debtors or Seller are required by law to retain, provided that Buyer shall receive a copy thereof; (b) duplicate copies of any records as necessary to enable the Debtors or Seller to file tax returns and reports; and (c) any books and records relating to the organization, ownership, existence or corporate record keeping of the Debtors or Seller. Agreement at § 1(e). |

20.    In accordance with Local Rule 6004-1(b), the Trustee is highlighting the location of the following "special provisions" included in the Agreement and Sale Order:

(a)    To the extent the Carve-Out and allocation of proceeds of the Liquidated Location Set 2 Assets provided for in the Agreement constitutes "a waiver, release, or satisfaction of any claim" held by Buyer, provisions relating to such allocation are located at Section 6(b) of the Agreement and Paragraphs F-G, Q, and 21 of the Sale Order. *See* Local Rule 6004-1(b)(3).

(b)    Similarly, to the extent the Carve-Out and allocation of proceeds of the Liquidated Location Set 2 Assets provided for in the Agreement constitutes "a release of sale proceeds on or after the closing, or allocation of sale proceeds between or among sellers, without further court order," provisions relating to such allocation are located at Section 6(b) of the Agreement and Paragraphs F-G, Q, and 21 of the Sale Order. *See* Local Rule 6004-1(b)(6).

(c)    Notwithstanding any other provision in the Agreement, provisions limiting any successor liability as to Buyer, except with respect to the Assumed Liabilities, are located at Section 4(b) of the Agreement and Paragraphs L, and 10-11 of the Sale Order. *See* Local Rule 6004-1(b)(8).

      (d)      Paragraphs C, R, and 22 of the Sale Order provides for a waiver of the 14-day stay under Bankruptcy Rules 6004(h) and 6006(d). *See* Local Rule 6004-1(b)(10).

## D.    **Assumption and Assignment Procedures**

21.    The Trustee proposes the following procedures for providing notice to each Counterparty to an applicable Contract regarding the potential assumption and assignment of such Contract and the associated proposed Cure Amounts:

      (a)      **Potential Contract Assumption Notice**. Contemporaneously with the filing of this Motion, the Trustee is filing with the Court and serving upon each Counterparty the Potential Contract Assumption Notice attached hereto as **Exhibit B**. The Potential Contract Assumption Notice sets forth, to the extent known: (i) the name of, or a description of, each applicable Contract which may be assumed and assigned; (ii) the name of the applicable Counterparty; (iii) the Trustee's good-faith calculation of Cure Amounts, if any, with respect to each Contract; and (iv) the deadline and procedures for filing objections. Further, the Potential Contract Assumption Notice clearly states that (i) the inclusion of any Contract does not mean that such Contract will or must be assumed and assigned to Buyer; (ii) Buyer reserves all rights to remove any Contracts from the list included on the Potential Contract Assumption Notice up through forty-five (45) calendar days after entry of the Sale Order (the "<u>Assumption and Assignment Deadline</u>"); (iii) the failure to include, or the subsequent removal of, any Contract does not mean that such Contract is or will be rejected by the Trustee; and (iv) inclusion of a Contract on the Potential Contract Assumption Notice shall not constitute an admission by the Trustee or Buyer that any listed agreement is an executory contract or unexpired lease within the meaning of the Bankruptcy Code.

      (b)      **Cure Amounts**. Payment of the applicable Cure Amounts by Buyer shall (i) cure all monetary defaults under each Contract that is assumed, (ii) compensate the Counterparty for any actual pecuniary loss resulting from such default, and (iii) together with the assumption of the Contract by the Trustee and its assignment to Buyer, provide adequate assurance of future performance as required by Section 365(b)(1) of the Bankruptcy Code.

      (c)      **Objections**. Any objection to the proposed assumption or assignment of any of the Contracts listed on the Potential Contract Assumption Notice, the adequacy of Buyer's assurance of future performance, or the proposed Cure Amounts (each, an "<u>Assumption Objection</u>") must: (i) be in writing; (ii) comply with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Local Rules of this Court; (iii) state with specificity the nature of the Assumption Objection, and, if applicable, the correct Cure Amount asserted by the objecting Counterparty with supporting documentation; and (iv) be filed

with the Court and served upon the parties below (collectively, the "Objection Notice Parties"), so as to be **actually received** by the date of the Sale Hearing (the "Assumption Objection Deadline"). The Objection Notice Parties are as follows:

(i)    The Trustee: Andrew Sklar, 1020 Laurel Oak Road, Suite 203, Voorhees, NJ 08043;

(ii)    Proposed counsel to the Trustee: Fox Rothschild LLP, Two Commerce Square, 2001 Market Street, Suite 1700, Philadelphia, PA 19103, Attn: Michael Menkowitz, Esq. (mmenkowitz@foxrothschild.com); Jesse Harris, Esq. (jesseharris@foxrothschild.com); and Matthew Skolnick, Esq. (mskolnick@foxrothschild.com);

(iii)    Counsel to Buyer: Gellert Seitz Busenkell & Brown LLC, 1201 North Orange Street, 3rd Floor, Wilmington, DE 19801, Attn: Ronald Gellert, Esq. (rgellert@gsbblaw.com); and

(iv)    The Office of the United States Trustee: US Department of Justice, Office of the US Trustee, One Newark Center, Suite 2100, Newark, NJ 07102.

(d)    **No Objection**. If no timely Assumption Objection is filed and served by the Assumption Objection Deadline with respect to any Contract listed on the Potential Contract Assumption Notice, any Cure Amount listed in therein shall be binding upon the Trustee, Buyer, and the applicable Counterparty, and no additional amounts shall be required to be paid in connection with the assumption and assignment of such Contract; ***provided, however***, that Buyer reserves all rights to decline to assume any such Contract and pay any relevant Cure Amounts until the expiration of the Assumption and Assignment Deadline.

(e)    **Dispute Resolution.** In the event the Trustee and a Counterparty are unable to resolve an Assumption Objection, the Trustee may, with the consent of Buyer, proceed to assume and assign the applicable Contract, provided that Buyer agrees to pay the non-disputed portion of the Cure Amount asserted by the Counterparty, pending resolution of the dispute by the Court or by agreement of the parties.

(f)    **Closing Contract Assumption Notice**. As soon as practicably possible after the Closing of the Sale Transaction, the Trustee will file and serve upon each affected Counterparty a notice (the "Closing Contract Assumption Notice") setting forth: (i) the name of, or a description of, each applicable Contract that Buyer is assuming as of the Closing (each an "Assumed Contract"); (ii) the name of the applicable Counterparty; and (iii) the applicable Cure Amounts, including any adjusted Cure Amounts agreed to following the filing of the Potential Contract Assumption Notice or the resolution of an applicable Assumption Objection. In any event, Buyer reserves all rights until the

expiration of the Assumption and Assignment Deadline to determine whether any additional Contracts previously listed on the Potential Contract Assumption Notice should be added to the Assumed Contracts list.

(g)    **Final Contract Assumption Notice.**  To the extent Buyer elects to assume any additional Contracts previously listed on the Potential Contract Assumption Notice following the filing of the Closing Contract Assumption Notice, promptly after the expiration of the Assumption and Assignment Deadline, the Trustee will file and serve upon each affected Counterparty a notice (the "Final Contract Assumption Notice") setting forth: (i) the name of, or a description of, each additional Assumed Contract; (ii) the name of the applicable Counterparty; (iii) the applicable Cure Amounts, including any adjusted Cure Amounts agreed to following the filing of the Potential Contract Assumption Notice or the resolution of an applicable Assumption Objection; and (iv) the effective date of assumption for each additional Assumed Contract.  The Trustee and Buyer will not be permitted to add or remove any Contracts from the list of Assumed Contracts after the expiration of the Assumption and Assignment Deadline.

(h)    **Reservation of Rights.**  In any event, the failure to include any Contract on the list of Assumed Contracts included with the Closing Contract Assumption Notice and/or the Final Contract Assumption Notice (if any) does not mean that such Contract is or will be rejected by the Trustee.  The Trustee reserves all rights with respect to any Contracts not assumed by Buyer.  To the extent necessary, upon the filing of a subsequent motion, and subject to Court approval, the Trustee reserves all rights to request an extension of the deadline to assume or reject any Contract, in accordance with Section 365(d) of the Bankruptcy Code.

## RELIEF REQUESTED

22.    By this Motion, the Trustee seeks the entry of the Sale Order, substantially in the form attached hereto as **Exhibit A**, pursuant to 11 U.S.C. §§ 105, 363(b), 363(f), 363(k), 363(m), and 365, Fed. R. Bankr. P. 6004, 6006, and 9019, and N.J. Bankr. L.R. 6004-1 approving (i) the Agreement and authorizing the Sale Transaction with Buyer, including (a) the private sale of the Acquired Location Set 1 Assets, and (b) the proposed Carve-Out with respect to the proceeds of the Liquidated Location Set 2 Assets; and (ii) the Assumption and Assignment Procedures.

## BASIS FOR RELIEF REQUESTED

A.    **The Sale of the Acquired Location Set 1 Assets Under the Agreement is Appropriate, Pursuant to Bankruptcy Code Section 363.**

17

23.     Section 363(b) of the Bankruptcy Code provides that a Trustee "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." *See* 11 U.S.C. § 363(b)(l).  To approve a use, sale, or lease, other than in the ordinary course of business, the Court must find "some articulated business justification."  *See In re Martin (Myers v. Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Abbotts Dairies of Pennsylvania. Inc*., 788 F.2d 143 (3d Cir. 1986) (requiring a good faith purchase); *In re Delaware and Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991) (concluding that the requirements for a sale outside the ordinary course of business include a sound business purpose, adequate and reasonable notice, a fair and reasonable price, and a good faith purchaser).

24.     Consistent with this approach, courts in the Third Circuit have required that such use, sale, or lease be based upon a trustee's sound business judgment.  *See, e.g., In re Decora Indus., Inc.*, 2002 WL 32332749, *2 (D. Del. May 20, 2002); *Delaware & Hudson Ry. Co.*, 124 B.R. at 176; *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (Bankr. D. Del. 1999).  A trustee's showing of sound business justification need not be unduly exhaustive; instead, the trustee is "simply required to justify the proposed disposition with sound business reasons."  *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).

25.     Bankruptcy courts are given substantial discretion in deciding whether to authorize a sale of the debtor's assets outside of the ordinary course of business.  *See In re Chateaugay Corp.*, 973 F.2d 141, 144 (2d Cir. 1992).

26.     The Trustee, through the exercise of his business judgment, has determined that the sale of the Acquired Location Set 1 Assets, under the terms of the Agreement, is in the best interests of the Debtors, their creditors, and the bankruptcy estates.  Buyer's Purchase Price, including (i) the cancellation of $12,000,000.00 in secured debt, (ii) the assumption and payment of all Carrying

Costs and Cure Amounts, and (iii) additional cash consideration for certain Liquor Licenses, is the highest and best offer received for the Acquired Location Set 1 Assets, and in the Trustee's business judgment, is reasonable and represents the fair market value of the Debtors' rights, title, and interest in the Acquired Location Set 1 Assets. This is especially true when the Agreement is taken as a whole, and when the purchase of the Acquired Location Set 1 Assets is considered in conjunction with the Carve-Out provided for the estates in the proposed allocation of the proceeds of the Liquidated Location Set 2 Assets. Indeed, the Trustee believes that there is no other party capable of or willing to match the terms agreed to by Buyer, or exceed the total value that the Agreement confers on the estates. Moreover, Buyer has the capability to close on the Sale Transaction in an expeditious manner. Considering the standards set forth above, the Trustee believes that the Agreement with Buyer is the best way to maximize the value of the Acquired Location Set 1 Assets and the recoveries of the estates and their creditors.

27.    Accordingly, in the exercise of the Trustee's business judgment, the Trustee submits that the Sale Transaction, under the terms of the Agreement, should be approved.

**B.    The Sale of the Acquired Location Set 1 Assets Free and Clear of All Liens, Claims, and Encumbrances, Including Successor Liability, is Appropriate Under Bankruptcy Code Section 363.**

28.    The Trustee respectfully submits that it is appropriate to sell the Acquired Location Set 1 Assets to Buyer free and clear of any liens, claims, interests, and encumbrances, except for the Carrying Costs, Cure Amounts, and other Assumed Liabilities, pursuant to 11 U.S.C. § 363(f).

29.    Section 363(f) of the Bankruptcy Code authorizes a trustee or debtor to sell assets free and clear of liens, claims, interests and encumbrances if:

(i)    applicable nonbankruptcy law permits sale of such property free and clear of such interests;

(ii)    such entity consents;

(iii) such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

(iv) such interest is in bona fide dispute; or

(v) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

*See* 11 U.S.C. § 363(f).

30. Upon information and belief, the Acquired Location Set 1 Assets are encumbered solely by the first-priority Prepetition Secured Lien held by Buyer. Accordingly, Buyer has consented to the Sale Transaction free and clear of liens, claims, interests, and encumbrances (to the extent outlined in the Agreement) by agreeing to enter into the Agreement with Buyer. In any event, to the extent any other party holds such liens, claims, interests, and encumbrances, the Trustee proposes that the absence of any objections to the entry of the Sale Order approving this Motion, following the provision of notice, be deemed "consent" to the Sale Transaction, within the meaning of Section 363(f)(2) of the Bankruptcy Code. As such, the requirements of Section 363(f) of the Bankruptcy Code are satisfied.

31. Under the Agreement, Buyer will be assuming only the Assumed Liabilities expressly assumed and set forth therein. Buyer, therefore, should not be liable for any of the Debtors' liabilities in connection with the sale of the Assets as a successor to the Debtors' Business or otherwise, except as expressly assumed.

32. Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes free from successor liability resulting from pre-existing claims. *See Ninth Ave. Remedial Group v. Allis-Chalmers Corp.*, 195 B.R. 716, 732 (N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); *MacArthur Co. v. Johns-Manville Corp. (In*

*re Johns-Manville Corp.)*, 837 F.2d 89, 93-94 (2d Cir. 1988) (channeling of claims to proceeds consistent with intent of sale free and clear under section 363(f) of the Bankruptcy Code); *In re New England Fish Co.*, 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property in free and clear sale included free and clear of Title VII employment discrimination and civil rights claims of debtor's employees); *In re Hoffman*, 53 B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor license free and clear of any interest permissible even though the estate had unpaid taxes); *American Living Sys. v. Bonapfel (In re All Am. Of Ashburn, Inc.)*, 56 B.R. 186, 190 (Bankr. N.D. GA 1986) (product liability claims precluded on successor doctrine in a sale of assets free and clear); *WBQ P'ship v. Virginia Dept. of Med. Assistance Servs. (In re WBQ P'ship)*, 189 B.R. 97, 104-05 (Bankr. E.D. Va. 1995) (Commonwealth of Virginia's right to recapture depreciation is an "interest" as used in section 363(f)).

33.      The purpose of an Order purporting to authorize the transfer of assets free and clear of all "interests" would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against Buyer, despite arising from the Debtors' pre-sale conduct.  Under Section 363(f) of the Bankruptcy Code, Buyer is entitled to know that the Acquired Location Set 1 Assets are not subject to latent claims that will be asserted against Buyer after the sale closes.

34.      Accordingly, in the exercise of the Trustee's business judgment, the Trustee submits that the sale of the Acquired Location Set 1 Assets to Buyer, upon the terms and conditions set forth in the Agreement, free and clear of liens, claims, interests, and encumbrances, except for the Assumed Liabilities, pursuant to 11 U.S.C. §§ 105 and 363, Fed. R. Bankr. P. 6004, and N.J. Bankr. L.R. 6004-1 should be approved.

**C.      Buyer is a Good Faith Purchaser and is Entitled to the Full Protections of Bankruptcy Code Section 363(m).**

35.    The Trustee respectfully submits that Buyer is purchasing the Assets in good faith, and as such, is entitled to the protections set forth in 11 U.S.C. § 363(m).

36.    Bankruptcy Code Section 363(m) provides:

The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  While the Bankruptcy Code does not define "good faith," the Third Circuit in *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986) held that:

[t]he requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings.  Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted); *see Kabro Assocs. of W. Islip, LLC v. Colony Hill Assocs.*, 111 F.3d 269, 276 (2d Cir. 1997) ("Typically, the misconduct that would destroy a [buyer]'s good faith status at a judicial sale involves fraud, collusion between the [buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In re Bakalis*, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998); *see also Cinicola v. Scharffenberger*, 248 F.3d 110, 121 (3d Cir. 2001) ("To promote certainty and finality in bankruptcy sales, § 363(m) prohibits the reversal of a sale to a good faith purchaser of bankruptcy estate Real Property if a party failed to obtain a stay of the sale."); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("[P]ursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal.").

37.    The Agreement was negotiated in good faith and at arm's length between the Trustee and Buyer, free of any collusions.  Buyer is not a current "insider" or "affiliate," as defined

in Section 101 of the Bankruptcy Code.  Therefore, the Trustee respectfully submits that the Buyerr

is entitled to the protections set forth in 11 U.S.C. § 363(m).

    **D.**    **A Private Sale is Appropriate**

    38.    Bankruptcy Rule 6004(f) and Local Rule 6004-1 permit a trustee to conduct a

private sale pursuant to section 363.  Specifically, Bankruptcy Rule 6004(f) provides that "[a]ll

sales not in the ordinary course of business may be by private sale or by public auction."  Fed. R.

Bankr. P. 6004(f)(1); *see Berg v. Scanlon (In re Alisa P'ship)*, 15 B.R. 802, 802 (Bankr. D. Del.

1981) ("[T]he manner of [a] sale is within the discretion of the trustee . . .").

    39.    Considering Bankruptcy Rule 6004(f) and case law regarding section 363 sales, a

trustee may conduct a private sale if a good business reason exists.  *See*, *e.g.*, *In re MF Global,

Inc.*, 535 B.R. 596, 605 (Bankr. S.D.N.Y. 2015) ("The business judgment of a trustee is entitled to

great deference"); *In re Pritam Realty, Inc.*, 233 B.R. 619 (D.P.R. 1999) (upholding the bankruptcy

court's approval of a private sale conducted by a Chapter 11 debtor); *In re Condere Corp.*, 228

B.R. 615, 629 (Bankr. S.D. Miss. 1998) (authorizing the private sale of debtor's tire company

where "[d]ebtor has shown a sufficient business justification for the sale of the assets to the

[p]urchaser"); *In re Embrace Sys. Corp.*, 178 B.R. 112, 123 (Bankr. W.D. Mich. 1995) ("A large

measure of discretion is available to a bankruptcy court in determining whether a private sale

should be approved. The court should exercise its discretion based upon the facts and

circumstances of the proposed sale."); *In re Wieboldt Stores, Inc.*, 92 B.R. 309 (N.D. Ill. 1988)

(affirming right of chapter 11 debtor to transfer assets by private sale).

    40.    Indeed, courts regularly approve private sales of estate property pursuant to section

363(b)(1) when there has been a valid business reason for not conducting a public auction.  *See*,

*e.g.*, *In re Art Van Furniture, LLC* (n/k/a Start Man Furniture, LLC), Case No 20-10553-CTG

(Bankr. D. Del. Jan. 6, 2021); *Aquion Energy, Inc.*, Case No. 17-10500 (KJC) (Bankr. D. Del. May 30, 2017) (approving private sale of machinery and equipment for over $400,000); *In re Evergreen Int'l Aviation, Inc.*, Case No. 13-13364 (MFW) (Bankr. D. Del. Feb. 26, 2014) (approving private sale of helicopters for $350,000); *In re Buffets Holdings, Inc.*, Case No. 08−10141 (MFW) (Bankr. D. Del. Feb. 3, 2009) (approving private sale of real property for approximately $2.4 million); *In re W.R. Grace & Co.*, Case No. 01−01139 (JKF) (Bankr. D. Del. Dec. 18, 2008) (approving the private sale of real property for approximately $3.8 million); *In re Wellman, Inc.*, Case No. 08−10595 (SMB) (Bankr. S.D.N.Y. Oct. 6, 2008) (approving private sale of industrial complex capable of converting recycled carpet into nylon engineered resins for $17.9 million).

41.     The Trustee submits that the proposed private sale to Buyer, in accordance with the Agreement, is appropriate in light of the facts and circumstances of these Chapter 7 Cases.  An even longer and more complicated sale process with bid procedures and a public auction would have been unlikely to net the estates an appreciable benefit through a substantially increased sale price.  Given the present value of the Debtors' Assets, the Debtors' inability to find willing investors or purchasers prior to the Petition Date, and Buyer's ability to credit bid up to approximately $18 million, the Trustee believes that no other potential buyer would have been willing or able to compete with Buyer in an auction, or exceed the value to be received through the Agreement with Buyer.  As such, a public sale process would have run the risk of the Trustee and the estates needlessly incurring significant costs and expenses to likely end up with a similar, or even potentially less valuable transaction, with Buyer.  Accordingly, it is the Trustee's business judgment that the upside of a public sale process and auction is substantially outweighed by (i) the costs and expenses to be incurred in running such a sale process and (ii) the combined value of the Purchase Price for the Acquired Location Set 1 Assets and the Carve-Out.

42.     After careful consideration and consultation with his professionals, the Trustee determined that a private sale with Buyer was the best way to maximize value for the estates. Because a private sale is specifically authorized under Bankruptcy Rule 6004, and because the Trustee believes that the private sale under the circumstances is a sound exercise of business judgment, the Trustee requests that the Court approve the proposed Sale Transaction with Buyer, in accordance with the Agreement.

## E.     The Agreement Between the Seller and Buyer Regarding the Carve-Out of the Liquidated Location Set 2 Assets is Justified Under Bankruptcy Rule 9019.

43.     To the extent the portion of the Agreement pertaining to the Carve-Out of proceeds in connection with the Liquidated Location Set 2 Assets should be considered an agreement to settle or compromise, the Trustee submits that such agreement between the parties should be approved, consistent with Fed. R. Bankr. P. 9019.

44.     Bankruptcy Rule 9019(a) provides that "on the trustee's motion and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor . . . and to any other entity as the court may direct." Fed. R. Bankr. P. 9019(a); *see also Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996).

45.     In determining whether a settlement should be approved under Bankruptcy Rule 9019, the Court must "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." *Martin*, 91 F.3d at 393.  To do so, courts should balance the following four factors: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *Id.*

25

46.     A settlement need not be the best possible compromise but fall "within the reasonable range of litigation possibilities somewhere above the lowest point in the range of reasonableness." *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 833 (Bankr. D. Del. 2008).

47.     The Trustee respectfully submits that the Court should approve the Sale Transaction, including the portion of the Agreement pertaining to the Carve-Out, because it is supported by sound business justifications, the terms of the Agreement are within the reasonable range of litigation possibilities, and the four *Martin* factors weigh in favor of approval.

48.     Rather than incurring significant attorneys' fees and costs to challenge the extent, validity, and priority of Buyer's Prepetition Secured Lien and/or attempting to negotiate with Buyer in pursuit of obtaining a separate carve-out for unsecured creditors, the Agreement's proposal to carve out: (i) ninety percent (90%) of all sale proceeds from the liquidation and sale of all inventory and equipment located in Location Set 2, and (ii) forty percent (40%) of the proceeds with respect to the remaining Liquidated Location Set 2 Assets and other Split Assets (as set forth in greater detail below and in the Agreement), with a guaranteed minimum recovery of at least $400,000.00 on account of such proceeds, will avoid the accrual of significant administrative expenses and prevent prolonged litigation from needlessly stalling the advancement of the Chapter 7 Cases.  Moreover, without the agreed-upon Carve-Out, meaningful recoveries for general unsecured creditors would have been unlikely.

49.     The Agreement is the product of extensive, good-faith negotiations between the parties.  The Agreement is supported by sound business justifications and represents a desirable outcome for the Debtors' estates and creditors.

50.     Accordingly, it is the Trustee's business judgment that the Agreement is in the paramount interest of the creditors and should be approved by the Court.

**F.** **The Assumption and Assignment Procedures Should be Authorized, Pursuant to Section 365.**

51.     Section 365(a) of the Bankruptcy Code provides that a trustee "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  Courts employ the business judgment standard in determining whether to approve a trustees's decision to assume or reject an executory contract or unexpired lease.  *See*, *e.g.*, *In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court"); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that a debtor's decision to assume or reject executory contracts is governed by the business judgment standard and may only be overturned if the decision is the product of bad faith, whim, or caprice).  The "business judgment" test in this context only requires that a trustee demonstrate that assumption or rejection of an executory contract or unexpired lease benefits the estate.  *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987).

52.     Any assumption and assignment of the Assumed Contracts is an exercise of the Trustee's sound business judgment because the transfer of such Assumed Contracts is necessary to the Trustee's ability to obtain the best value for the Acquired Assets.  The assumption and assignment of Assumed Contracts is a critical component of the Agreement.  Buyer would not have agreed to the terms of the Agreement if the potential to assume and assign the Debtors' Executory Contracts and Unexpired Leases was excluded, especially given that the Debtor's pre-existing agreements with landlords and vendors are integral to the ownership and operation of the Debtors' Assets.  Given that consummation of the Sale Transaction is critical to the Trustee's

efforts to maximize the value for the estates, the Trustee's assumption and assignment of the Assumed Contracts is an exercise of sound business judgment and, therefore, should be approved.

53.     The consummation of the Sale Transaction, including the assignment of any Assumed Contracts, will be contingent upon the Trustee's compliance with the applicable requirements of section 365 of the Bankruptcy Code.  Section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Assumed Contracts be assumed or cured, or that the Trustee provides adequate assurance that such defaults will be promptly cured.  The Trustee's assumption and assignment of the Assumed Contracts will be contingent upon payment of the Cure Amounts, and effective no later than the Assumption and Assignment Deadline.

54.     As set forth above, the Trustee will serve on each Counterparty the Potential Contract Assumption Notice, which will set forth the Trustee's good-faith calculations of Cure Amounts with respect to each Contract listed on the Potential Contract Assumption Notice. Counterparties will have a meaningful opportunity to raise any objections to the proposed assumption of their Contracts.

55.     As soon as practicably possible following the Closing, the Trustee shall file and serve upon each affected Counterparty the Closing Contract Assumption Notice, setting forth the list of Assumed Contracts as of the date of the Closing, which will reflect any adjusted Cure Amounts agreed to following the filing of the Potential Contract Assumption Notice or the resolution of an applicable Assumption Objection; provided, however, that Buyer will have a period of forty-five (45) days from the entry of the Sale Order to determine whether any additional Contract previously listed on the Potential Contract Assumption Notice should be added to the list of Assumed Contracts.

56.     Pursuant to Section 365(f)(2) of the Bankruptcy Code, a trustee may assign an executory contract if "adequate assurance of future performance by the assignee of such contract or lease is provided."  11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *See Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (citation omitted); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean an absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) (finding that, "[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance"). Among other things, adequate assurance may be provided by evidencing the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when the prospective assignee of a lease has financial resources and has expressed willingness to devote sufficient funding to the business to give it a strong likelihood of succeeding). Adequate assurance may be provided by demonstrating, among other things, the assignee's financial health and experience in managing the type of enterprise or property assigned. *See id.* (finding that industrial expertise, past success in running a similar business and financial wherewithal satisfied the adequate assurance requirement of section 365 of the Bankruptcy Code).

57.     Each affected Counterparty to a Contract listed on the Potential Contract Assumption Notice will have an opportunity to object to the ability of Buyer to provide adequate assurance.  To the extent necessary, the Trustee and Buyer will present facts at the Sale Hearing

to show the financial wherewithal, and willingness and ability of Buyer to perform under the applicable Contracts.

58.    Because the Assumption and Assignment Procedures are carefully designed to ensure that Counterparties receive timely and sufficient notice with respect to the disposition of their applicable Contract as part of the Sale Transaction, the Trustee respectfully requests that the Court approve the Assumption and Assignment Procedures.  In light of the foregoing, the assumption and assignment of any Assumed Contracts, in accordance with the Assumption and Assignment Procedures, would satisfy the requirements of Section 365 of the Bankruptcy Code and should be approved.

59.    Finally, to facilitate the assumption and assignment of the Assumed Contracts, the Trustee further requests that the Court find that all anti-assignment provisions contained therein, whether such provisions expressly prohibit or have the effect of restricting or limiting assignment of such Assumed Contracts, are unenforceable and prohibited, pursuant to Section 365(f) of the Bankruptcy Code.

### G.    Waiver of Fourteen-Day Stay Period

60.    The Trustee requests that the Court waive the requirements under Fed. R. Bankr. P. 6004(h) and 6006(d), so that the Sale Transaction with Buyer may close immediately upon satisfaction of the conditions precedent in the Agreement, rather than being subject to a fourteen (14)-day waiting period.

61.    Fed. R. Bankr. P. 6004(h) provides that an Order authorizing the "use, sale, or lease of property … is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  Similarly, Bankruptcy Rule 6006(d) provides that an Order authorizing the assumption or assignment of an executory contract or unexpired lease "is

stayed until the expiration of the fourteen days after entry of the order, unless the court orders otherwise."

62.     The purpose of these stay provisions is to afford an objecting party time to seek appellate relief before an Order becomes effective. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  However, courts frequently waive or shorten the stay period where doing so is necessary to prevent value erosion and no objections remain unresolved.  *See* 10 Collier on Bankruptcy ¶ 6004.11 (Richard Levin & Henry J. Sommer eds., 16th ed.) (noting that the fourteen-day stay should be eliminated "where there has been no objection to the procedure," and may be reduced where an objection is overruled and an appeal is promptly pursued).

63.     As set forth above, the relief requested herein is necessary and appropriate to maximize the value of the Debtors' Assets for the benefit of the Debtors' creditors.  Accordingly, the Trustee submits that ample cause exists to justify waiving the fourteen-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d), in each case, to the extent that such stay applies to the relief requested herein.

## WAIVER OF MEMORANDUM OF LAW

64.     The Trustee respectfully requests that the Court waive the requirement to file a separate memorandum of law pursuant to Local Rule 9013-1(a)(3) because the legal basis upon which the Trustee relies is set forth herein and the Motion and does not raise any novel issues of law.

## NO PRIOR REQUEST

65.     No prior request for the relief sought in this Motion has been made to this or any other court.

## NOTICE

Notice of this Motion will be provided to: (a) the Office of the United States Trustee for the District of New Jersey; (b) counsel for the Debtors; (c) all known Counterparties to the Debtors' Executory Contracts and Unexpired Leases; (d) all known Interested Parties; (e) all parties identified on the Debtors' creditor matrices; (f) any party that has filed a proof of claim in the Debtors' cases as of this Motion; and (g) those persons who have requested notice pursuant to Bankruptcy Rule 2002.  The Trustee submits that no further notice is required and requests that the Court determine such notice is adequate and proper.

*[Remainder of page left intentionally blank]*

## CONCLUSION

WHEREFORE, the Trustee respectfully requests that the Court grant the Motion and

enter an Order, substantially in the form attached hereto:

(a)     Authorizing the Trustee to consummate the Sale Transaction with Buyer, in accordance with the terms set forth in the Agreement, for consideration of the Purchase Price, free and clear of liens, claims, interests, and encumbrances, pursuant to 11 U.S.C. §§ 105, 363(b), (f), (m), and (k), Fed. R. Bankr. P. 6004 and 9019, and N.J. Bankr. L.R. 6004-1; and

(b)     Approving the Assumption and Assignment Procedures, and authorizing the Trustee to assume and to assign the Assumed Contracts to Buyer, in accordance with the Assumption and Assignment Procedures and the terms set forth in the Agreement, pursuant to 11 U.S.C. § 365 and Fed. R. Bankr. P. 6006; and

(c)     Waiving the fourteen (14) day stay provided for in Bankruptcy Rule 6004(h) and 6006(d); and

(d)     Granting such other and further relief as the Court deems appropriate.

Respectfully submitted:

**FOX ROTHSCHILD LLP**

*/s/ Michael G. Menkowitz*
Michael G. Menkowitz, Esq. (Bar No. MM5164)
Jesse M. Harris, Esq.
Matthew A. Skolnick, Esq.
Two Commerce Square
2001 Market Street – Suite 1700
Philadelphia, PA 19103
215-299-2000
mmenkowitz@foxrothschild.com
jesseharris@foxrothschild.com
mskolnick@foxrothschild.com

*Proposed Attorneys to Andrew Sklar,*
*Chapter 7 Trustee*

Dated: October 28, 2025